# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

January 12, 2009

Charles R. Fulbruge III
Clerk

No. 05-70046

JONATHAN BRUCE REED

Petitioner-Appellant

v.

NATHANIEL QUARTERMAN, Director, Texas Department of Criminal
Justice, Correctional Institutions Division

Respondent-Appellee

Appeal from the United States District Court
for the Northern District of Texas

Before HIGGINBOTHAM, DAVIS, and PRADO, Circuit Judges.

PRADO, Circuit Judge:

Over thirty years ago, Wanda Wadle ("Wadle") was murdered in her apartment. A jury convicted Petitioner-Appellant Jonathan Bruce Reed ("Reed") of capital murder for this crime. Reed now seeks habeas corpus relief from his conviction and sentence of death. This case has spent three decades winding its way through the state and federal court systems. Today, we add to that lengthy history by concluding that Reed is entitled to habeas corpus relief for his Batson claim. We therefore reverse and remand to the district court with instructions to grant the writ and order Reed's release from custody unless the State grants him a new trial within 120 days from the date the district court's order.

## I. FACTUAL AND PROCEDURAL BACKGROUND

We have previously described the facts of the crime and the lengthy procedural history of this case:

>    Around 12:40 p.m. on November 1, 1978, Kimberly Pursley ("Pursley"), Wadle's roommate, returned to their shared apartment. As Pursley entered the apartment, she heard a man's voice from Wadle's bedroom say "don't come in here" and "stay out there." Pursley remained in the living room. After a few moments, a man stepped out of the bedroom and snapped closed a knife sheath. The man stated that he was from maintenance and was there to check the air filter, and he pointed toward the ceiling. Pursley looked toward the ceiling and then noticed her roommate's nude body on the floor of the bedroom. The man then threw Pursley to the floor and bound and gagged her. He asked if she had any money, and Pursley nodded yes. The man began to search Pursley and Wadle's purses, which were located on the living room sofa. He made several circuits of the apartment during which he drank water from a glass in the kitchen and looked through the bedroom and living room areas. He then attempted to strangle Pursley, straddling her with his legs and grabbing her throat. Pursley feigned unconsciousness. The man released her throat and left the apartment.

>    Pursley managed to free herself from her bindings and went to check Wadle, whom she found with blood oozing from her mouth, her gaze fixed, and her hands tied with a telephone cord. Around Wadle's head were a plastic bag and belt pulled taut. Pursley went outside her apartment to call for help. A neighbor, Rosemary Asencio ("Asencio"), appeared and let Pursley into her apartment to call the police while she went to investigate Wadle's condition. Asencio found Wadle lying naked on her back with her legs spread apart and her head and shoulders under the bed. Asencio managed to remove the plastic bag and belt from Wadle's neck and began CPR. Emergency medical technicians arrived and took Wadle to the hospital, where she died nine days later without ever regaining consciousness.

>    Pursley identified Reed as her assailant in a corporeal lineup. At the same lineup, two other residents of Pursley and Wadle's apartment complex identified Reed as a person they had seen in the complex shortly before the time of the murder. These residents, Mikki Flanagan ("Flanagan") and Phil Hardin ("Hardin"), as well as Pursley, subsequently testified at Reed's trial. Flanagan testified that Reed came to her door shortly after noon on November 1, 1978,

claiming that he was there to check air conditioning filters. Hardin testified that he saw Reed in the complex around noon on November 1, 1978, wearing a red shirt and blue jeans. Pursley and Flanagan also testified that Reed had worn a red shirt and blue jeans. A fourth eyewitness was Ken Ezelle ("Ezelle"), a maintenance worker for the apartment complex who testified that he saw a man with a red shirt and blue jeans running away from the area of Wadle and Pursley's apartment, where a woman could be heard screaming. In his defense, Reed presented testimony from his employer and family members to establish that he could not have been in the vicinity of Wadle's apartment at 12:40 p.m. and that he was not wearing a red shirt and blue jeans on the day in question. Reed also relied on the absence of physical evidence connecting him to the crime.

In March 1979, Reed was convicted and sentenced to death for murdering Wadle in the course of committing robbery and aggravated rape. The trial court granted Reed's motion for a new trial, and Reed was tried again in 1983. At this second trial, in addition to the aforementioned eyewitnesses, the state produced as a rebuttal witness William McLean, Jr. ("McLean"), a cellmate of Reed in Texas prison who testified that Reed had confessed to him that he had murdered Wadle. In March 1983, Reed was again convicted of capital murder and sentenced to death. The Texas Court of Criminal Appeals [("TCCA")] affirmed Reed's conviction and sentence, and the United States Supreme Court denied certiorari. Reed v. State, No. 69,292 (Tex. Crim. App. March 29, 1995) (unpublished), cert. denied, 516 U.S. 1050 (1996). Reed then pursued state post-conviction relief. His state application for a writ of habeas corpus was denied by the Court of Criminal Appeals in September 1998. Ex parte Reed, No. 38,174-01 (Tex. Crim. App. Sept. 16, 1998) (unpublished), cert. denied, 526 U.S. 1021 (1999).

Reed filed his petition for federal habeas relief in 1999. The magistrate judge assigned to the case recommended that relief be denied, and the district court adopted the magistrate's recommendation on February 19, 2003. Reed filed a Rule 59(e) motion to alter or amend the judgment. Reed subsequently filed a motion to disqualify the magistrate judge, alleging that the magistrate judge had discussed Reed's case with a witness. The magistrate judge recused himself, and another magistrate judge was assigned. Reed's Rule 59(e) motion was then denied. Reed filed his notice of appeal on May 1, 2003. Reed also moved for a transfer of his case to a different district judge, alleging that the district judge to whom his case had been assigned exhibited signs of diminished

competency. In September 2003, this court vacated the district court's orders and remanded the case for reconsideration. Reed v. Dretke, No. 03-10432, 2003 U.S. App. LEXIS 27937 (5th Cir. Sept. 15, 2003). The district judge recused himself and a new district judge was assigned to the case. The district court held an evidentiary hearing on Reed's prosecutorial misconduct claims on February 24, 2005. On July 26, 2005, the district court denied habeas relief on all of Reed's claims. The district court granted a [certificate of appealability ("COA")] on Reed's Batson claim, and denied a COA as to all other of Reed's claims.

Reed v. Quarterman, 504 F.3d 465, 469-70 (5th Cir. 2007). We granted Reed COAs to pursue three additional claims: whether Reed is entitled to additional discovery, whether Reed was entitled to a jury instruction on the lesser included offense of murder under Beck v. Alabama, 447 U.S. 625 (1980), and whether Reed's sentence violates Penry v. Lynaugh (Penry I), 492 U.S. 302 (1989). Reed, 504 F.3d at 471-74, 477-79, 488-92.

## II. STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act ("AEDPA"), a federal court cannot grant habeas relief unless the state court adjudication of that claim either

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

28 U.S.C. § 2254(d); see Wiggins v. Smith, 539 U.S. 510, 520 (2003). Under § 2254(d)(1), a decision is contrary to clearly established federal law if "the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law" or "confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to [that precedent]." (Terry) Williams v. Taylor, 529 U.S. 362, 405 (2000). A decision

involves an unreasonable application of Supreme Court precedent if it "unreasonably extends a legal principle from [Supreme Court precedent] to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." Id. at 407. We must presume that the state court's factual findings are correct unless Reed meets his burden of rebutting that presumption by clear and convincing evidence. See 28 U.S.C. § 2254(e)(1).

## III. DISCUSSION

Reed argues that the State violated his rights under Batson v. Kentucky, 476 U.S. 79 (1986), when it used its peremptory challenges to strike all five eligible African-American members of the venire.

There are three steps to our Batson analysis. First, a defendant must present a prima facie case that the prosecution exercised its peremptory challenges on the basis of race. See id. at 96-97. Second, if the defendant meets this initial burden, the burden shifts to the prosecutor to present a race-neutral explanation for striking the jurors in question. See id. at 97-98. Finally, the court must determine whether the defendant has carried his burden of proving purposeful discrimination. See id. at 98. At the third step, "implausible or fantastic justifications may (and probably will) be found to be pretexts for purposeful discrimination." Purkett v. Elem, 514 U.S. 765, 768 (1995). There is no dispute here that Reed presented a prima facie case of discrimination or that the State offered race-neutral explanations for the peremptory strikes. Therefore, our inquiry solely involves Batson's third step. Reed argues that the State's proffered reasons are not persuasive justifications because they are mere pretexts for discrimination. We must consider whether the TCCA's conclusion that the prosecution did not discriminate on the basis of race in using its

peremptory strikes was an unreasonable determination of the facts.[1]  See 28 U.S.C. § 2254(d)(2).

A.    Batson Hearing

During the jury selection for Reed's second trial in 1983, Reed objected to the State's use of peremptory challenges to exclude all five of the eligible African-American potential jurors.  The trial judge rejected Reed's request to have the State explain its reason for striking these jurors.  In 1986, the Supreme Court ruled in Batson that a state violates a defendant's rights when the prosecutor discriminates on the basis of race when selecting a jury.  476 U.S. at 90.  In Powers v. Ohio, 499 U.S. 400 (1991), the Court ruled that Batson applies to white defendants, id. at 402, and in Trevino v. Texas, 503 U.S. 562 (1992) (per curiam), the Court held that Powers applied to all cases still pending on direct appeal, id. at 567.  Thereafter, the TCCA abated Reed's direct appeal and remanded the case to the trial court to conduct a Batson hearing.

At that hearing, the prosecutors from Reed's trial testified and offered race-neutral reasons for striking the five African-American venire members. The prosecutors explained that they did not have any independent recollection of the jury selection in Reed's trial.  Instead, they based their testimony on a review of the voir dire transcript for these five jurors and their standard practice in death penalty cases.  The trial court issued findings of fact and conclusions of law.  The trial court assumed, based on the TCCA's remand, that Reed had presented a prima facie case of discrimination.  The court then examined the State's proffered reasons for striking each African-American juror and found

---

[1] Although "a trial court's ruling on the issue of discriminatory intent must be sustained unless it is clearly erroneous," Snyder v. Louisiana, 128 S. Ct. 1203, 1207 (2008), here the trial court did not require the prosecution to explain its reasons for striking the black jurors. Therefore, there is no trial court ruling on discriminatory intent to which we must defer.  See id. at 1209 (noting that deference to the trial court was less appropriate when the trial judge never made a finding regarding the state's proffered reason for striking a black prospective juror).

that the State had provided race-neutral reasons for each peremptory challenge it used. The court noted that "[n]either party suggested that the court review the transcription of the voir dire examination of any other venireman" and concluded that the defendant had failed to refute the State's race-neutral explanations for the strikes.

B.   Introduction of the Comparative Analysis

   1.   State procedural bar

On appeal to the TCCA, Reed presented a "comparative analysis" to establish a Batson violation. He analyzed the race-neutral reasons that the State proffered for striking the African-American jurors and asserted that the State accepted many white jurors who had the same characteristics. The TCCA, however, refused to consider Reed's comparative analysis, ruling that Reed had waived his comparative analysis argument by not raising it at the Batson hearing. Without the benefit of a comparative analysis, the TCCA found that Reed had not sustained his Batson challenge.

After exhausting his state habeas appeals, Reed sought federal habeas corpus relief. The district court also refused to consider Reed's comparative analysis for his Batson claim. The court reasoned that the TCCA's decision not to accept Reed's comparative analysis argument was sound given that the Batson hearing was not contemporaneous with jury selection and that the trial judge expressly put Reed on notice that he had not reviewed the voir dire of any jurors beyond the five African-American jurors who the State had challenged. Therefore, reviewing just the voir dire of the five African-American jurors and the race-neutral explanations the prosecutors proffered at the Batson hearing, the district court concluded that Reed failed to rebut the trial court's factual findings by clear and convincing evidence. The district court, however, granted Reed a COA on his Batson claim.

Reed characterizes the TCCA's decision not to consider his comparative

analysis as an inadequate procedural bar which was not firmly established or regularly followed before his case.[2] Indeed, it appears that the TCCA's decision on this point was contrary to its own law. In Tompkins v. State, 774 S.W.2d 195, 202 n.6A (Tex. Crim. App. 1987), the court chose not to consider the defendant's comparative analysis argument because the defendant failed to raise it at the Batson hearing. Four years later, in Young v. State, 826 S.W.2d 141, 146 (Tex. Crim. App. 1991), the court held that a defendant is "not required to request the trial judge to make his finding upon the Batson motion based upon a comparison analysis in order to have that very same evidence considered on direct appeal." Notably, in Young, the TCCA clarified that it was "not allowing appellant to raise matters on appeal which were not raised in the trial court. On the contrary, our ruling merely allows appellant to argue what is in evidence from the voir dire and the Batson hearing and why he should prevail on his Batson claim." Id. (footnote omitted). In Reed, the TCCA distinguished Young and relied on Tompkins by noting that the voir dire in a capital case (as in Tompkins) was longer and more complicated than in a noncapital case, and that in Reed's case the Batson hearing occurred many years after jury selection. See Reed v. State, No. 69,292 (Tex. Crim. App. Mar. 29, 1995) (unpublished).

The TCCA, however, has not distinguished Young in this manner either before or after Reed's appeal and instead has consistently relied upon the rule in Young that a defendant may make a comparative analysis argument on appeal even if the defendant did not present that argument to the trial court. No cases after Young, besides Reed, rely on Tompkins to reject the defendant's

---

[2] Specifically, Reed argues that the district court should have reviewed his Batson argument de novo because the TCCA's decision was not "on the merits," 28 U.S.C. § 2254(d), thereby making the AEDPA inapplicable. That is, Reed asserts that the TCCA's decision not to consider the comparative analysis amounted to a new "procedural bar" to his Batson claim that the state court had not firmly established or regularly followed, which would require us to review his claim de novo. See, e.g., Rosales v. Dretke, 444 F.3d 703, 707 (5th Cir. 2006).

comparative analysis. For example, in Vargas v. State, 838 S.W.2d 552, 556-57 (Tex. Crim. App. 1992), the court ruled that the defendant could present evidence from the jury selection to compare the responses of black venire persons who the state challenged with white venire persons who the state accepted. The court also rejected any distinction between capital and noncapital cases for this rule. Id. at 556. Judge Benavides, who wrote the court's decision, also wrote a separate concurrence in which he stated that although he disagreed with the decision in Young (and had dissented in that case), the rule from Young remained the law of Texas until the court explicitly overruled it. Id. at 557-58 (Benavides, J., concurring).

Reed, an unpublished decision, did not overrule Young, particularly given that the court has consistently applied Young both to capital and noncapital cases after Reed and has considered a comparative analysis argument even when the defendant did not present it to the trial court during a Batson hearing. See, e.g.,Watkins v. State, 245 S.W.3d 444, 448 (Tex. Crim. App. 2008) (noncapital case); Blanton v. State, No. 74,214, 2004 WL 3093219, at *10-12 (Tex. Crim. App. June 30, 2004) (capital murder case); Cornish v. State, 848 S.W.2d 144, 145 (Tex. Crim. App. 1993) (noncapital case); Tumblin v. State, No. 74,097, 2003 WL 1821467, at *6-7 (Tex. Crim. App. Mar. 19, 2003) (capital murder case); Gibson v. State, 117 S.W.3d 567, 573 (Tex. App. 2003), rev'd on other grounds, 144 S.W.3d 530, 531 (Tex. Crim. App. 2004) (noncapital case). It appears, therefore, that Reed is an outlier in faulting the defendant for not presenting a comparative analysis theory during the Batson hearing. Given this inconsistency, we find the TCCA's decision on this point puzzling. This court would have benefitted from the TCCA evaluating the comparative analysis in the first place. The Supreme Court's decision in Miller-El v. Dretke (Miller-El II), 545 U.S. 231 (2005), directs us to consider the comparative analysis, as

discussed below, and the state court has not rested its rejection of Reed's Batson claim on consistently applied state grounds.

### 2. Miller-El

In determining whether the district court erred in refusing to consider Reed's comparative analysis, it is prudent to consider in-depth a recent Supreme Court case with virtually identical facts. In Miller-El II, the Supreme Court granted habeas relief to the defendant on a Batson claim. 545 U.S. at 235. To understand the similarities between this case and Miller-El II, we must go back to the Batson hearing in Miller-El II.

Thomas Joe Miller-El's trial took place in 1986 in Dallas County—the same venue as Reed's trial. Id. at 235-36. During jury selection, prosecutors used peremptory strikes against ten qualified black venire members. Id. Miller-El objected, arguing that the prosecutor's strikes were discriminatory. Id. The trial court overruled his objections. Id. A jury convicted Miller-El of capital murder, and he appealed to the TCCA. Id. Later that year, the Supreme Court decided Batson. Thereafter, the TCCA remanded Miller-El's case to the trial court to conduct a Batson hearing. Id. During the hearing, the court reviewed the voir dire record of the challenged jurors and heard testimony from prosecutor Paul Macaluso ("Macaluso") on his reasons for striking these jurors.[3] Importantly, the trial judge stated that he would "reread the voir dire of the ten challenged jurors." That is, the trial court stated at the hearing that it was considering only the voir dire transcripts of the ten African-American jurors that the prosecution struck, not those of any other jurors. Further, the prosecutor noted, "[a]t no time has [Miller-El] urged that there are unchallenged venire persons who did not have these same traits that the prosecutors testified either

---

[3] Macaluso also oversaw the voir dire for Reed's trial and testified at Reed's Batson hearing.

at trial or in this hearing that they relied on in exercising the State's peremptory challenges." Miller-El did not respond to this statement and did not ask the court to consider any other portions of the voir dire transcript. After reviewing the voir dire transcript of only the challenged jurors, the judge accepted the prosecutor's race-neutral explanations for the strikes and found that there was "no purposeful discrimination." Miller-El II, 545 U.S. at 236. The TCCA affirmed, stating that it had "carefully reviewed the voir dire examination" of the prospective black jurors and found "ample support . . . for the prosecutor's racially neutral explanations." Miller-El v. State, No. 69,677, at 2 (Tex. Crim. App. Sept. 16, 1992) (per curiam) (unpublished). Again, it is important to emphasize that the TCCA never reviewed the entire voir dire transcript or considered a comparative analysis.

Miller-El then sought federal habeas relief. The district court rejected Miller-El's Batson argument without making any mention of a comparative analysis. See Miller-El v. Johnson, No. 3:96-CV-1992-H, 2000 U.S. Dist. LEXIS 7763 (N.D. Tex. June 5, 2000). Similarly, this court denied Miller-El a COA without ever mentioning a comparative analysis, instead focusing on Miller-El's argument that historical data of these prosecutors demonstrated repeated exclusion of African-Americans from juries. Miller-El v. Johnson, 261 F.3d 445, 451 (5th Cir. 2001). The Supreme Court reversed and granted a COA. Miller-El v. Cockrell (Miller-El I), 537 U.S. 322, 341 (2003). Without specifying that Miller-El had not presented a comparative analysis to either the state trial court or the TCCA, the Court noted that a "comparative analysis of the venire members demonstrates that African-Americans were excluded from petitioner's jury in a ratio significantly higher than Caucasians were." Id. at 331. Both Justice Scalia, who concurred, and Justice Thomas, who dissented, discussed the merits of Miller-El's comparison of the challenged black jurors and accepted white jurors. Id. at 351-53 (Scalia, J., concurring); id. at 361-63 (Thomas, J.,

dissenting).

On remand, this court rejected Miller-El's Batson claim on the merits. Miller-El v. Dretke, 361 F.3d 849, 862 (5th Cir. 2004). As to Miller-El's comparative analysis, we stated, "we can determine from the record that there were no unchallenged non-black venire members similarly situated, such that their treatment by the prosecution would indicate the reasons for striking the black members were not genuine." Id. at 856. That is, we considered the entire voir dire transcript as part of the record even though Miller-El did not present a comparison theory to the state trial court during his Batson hearing, and we rejected Miller-El's argument. Id. The Supreme Court reversed this court's decision, explicitly relying on the comparative analysis. Miller-El II, 545 U.S. at 241. In particular, the Court noted, "[m]ore powerful than these bare statistics . . . are side-by-side comparisons of some black venire panelists who were struck and white panelists allowed to serve." Id. This time, Justice Thomas, joined by Chief Justice Rehnquist and Justice Scalia in dissent, argued that the Court could not consider the comparative analysis because Miller-El had not presented it at his Batson hearing. Id. at 283 (Thomas, J., dissenting). Justice Thomas wrote,

> Miller-El's arguments gave the state court no reason to go leafing through the voir dire transcript. What is more, voir dire at Miller-El's trial lasted five weeks, and the transcript occupies 11 volumes numbering 4,662 pages. To think that two years after the fact a trial court should dredge up on its own initiative passing references to unseen questionnaires—references buried in a more than 4,600-page transcript no less—is unrealistic. That is why § 2254(d)(2) demands that state courts be taken to task only on the basis of evidence "presented in the State court proceeding." The 98 questionnaires before the parties, unlike the 10 questionnaires that Miller-El entered into evidence, were not "presented" to the state court.

Id. The majority soundly rejected Justice Thomas's argument:

> The dissent contends that comparisons of black and nonblack venire panelists, along with Miller-El's arguments about the prosecution's disparate questioning of black and nonblack panelists and its use of jury shuffles, are not properly before this Court, not having been "put before the Texas courts." But the dissent conflates the difference between evidence that must be presented to the state courts to be considered by federal courts in habeas proceedings and theories about that evidence. See 28 U.S.C. § 2254(d)(2) (state-court factfinding must be assessed "in light of the evidence presented in the State court proceeding"); Miller-El [I, 537 U.S.] at 348 (habeas petitioner must show unreasonability "in light of the record before the [state] court"). There can be no question that the transcript of voir dire, recording the evidence on which Miller-El bases his arguments and on which we base our result, was before the state courts, nor does the dissent contend that Miller-El did not "fairly presen[t]" his Batson claim to the state courts.

Id. at 241 n.2.[4] In fact, the Court even referred to the comparative analysis as something it would conduct, not something that the parties must submit. Id. at 241 ("While we did not develop a comparative juror analysis last time, we did note that the prosecution's reasons for exercising peremptory strikes against some black panel members appeared equally on point as to some white jurors who served." (emphasis added)). We recently agreed that Miller-El II requires us to consider a "comparative juror analysis" in a Batson claim. See United States v. Brown, No. 05-20997, 2008 WL 5255903, at *19-20 (5th Cir. Dec. 18, 2008) (noting that "there is some indication that both the prosecution and the court failed to take the comparative features of two venire members into account" and conducting the comparative analysis on appeal).

In sum, Miller-El II entailed virtually the exact same procedural posture as this case: both Miller-El's and Reed's trials occurred before the Court decided

---

[4] Recently, the majority of Justices again rejected this same argument from Justice Thomas. See Snyder, 128 S. Ct. at 1214-15 (Thomas, J., dissenting). The majority compared the state's treatment of the black juror it struck with several white jurors it accepted, even though the Louisiana Supreme Court had not used these same white jurors in its own comparison. Id. at 1211, 1214 n.*.

Batson. The TCCA remanded both Miller-El's and Reed's appeals for Batson hearings. At the Batson hearings, which occurred two years after the voir dire in Miller-El's trial and ten years after the voir dire in Reed's trial, neither defendant presented a comparative analysis, and at both hearings the trial court specifically stated that it would read only the voir dire transcript of the black jurors that the State had struck. Nevertheless, the Supreme Court considered the comparative analysis in Miller-El II. The similarities between Miller-El II and this case are striking. In Miller-El II, the Supreme Court, on habeas review, considered the entire voir dire transcript because the comparative analysis simply was a theory that involved the evidence before the state court. Id. The same is true here.

The district court's attempt to distinguish Miller-El II is unavailing. The district court stated,

> Here, in contrast to Miller-El, (1) the full transcript of voir dire was not before the trial court; (2) the State has objected to considering evidence not before the trial court in the Batson hearing . . . ; (3) the State expressly relies on the 28 U.S.C. § 2254(d)(2) requirement that this Court review state court adjudications "in light of the evidence presented in the State court proceeding," . . . ; and (4) it is clear that at the time of the Batson hearing, the state court judge had no independent recollection of the voir dire, aside from that limited portion that was introduced at the Batson hearing.

None of these distinctions compel a different result from Miller-El II. First, there is no evidence that the entire voir dire transcript was formally presented to the trial court in Miller-El's Batson hearing. In fact, the trial judge specifically stated, "I'm going to, of course, reread the voir dire of the ten challenged jurors." Miller-El never suggested that the judge read the entire voir dire transcript, even though the prosecutor pointed out that the defendant had not made a comparative analysis argument. Essentially the same thing happened in Reed's Batson hearing: the court noted that "[n]either party

suggested that the Court review the transcription of the voir dire examination of any other venireman" even after the court stated that it could not remember the jury selection, which had occurred ten years earlier. Therefore, in both cases, the trial court stated that it would read the voir dire transcripts of only the challenged jurors, and in both cases the defendant did not press further and ask the judge to review the entire voir dire. The failure of the defendant to explicitly point out other parts of the voir dire transcript did not preclude the Supreme Court from considering the comparative analysis in Miller-El II.

Second, it is true that the State objected to the TCCA considering the comparative analysis because Reed had not presented it at his Batson hearing, and it does not appear that the State made this same objection in Miller-El's case. But this is a distinction without a difference. That the State had not objected to the introduction of this evidence was irrelevant to the Supreme Court's decision to consider Miller-El's comparative analysis. Instead, the majority determined that the entire voir dire transcript was before the "state courts" (i.e., not just the TCCA) and that the comparative analysis simply was one theory using that evidence. Miller-El II, 545 U.S. at 241 n.2.

The majority's position in Miller-El II also defeats the district court's third distinction. Of course, 28 U.S.C. § 2254(d)(2) requires us to review the state court's adjudication "in light of the evidence presented in the State court proceeding." In Miller-El II, the Court determined that the entire voir dire was part of the record, and hence, part of the evidence Miller-El presented, even if the state court did not consider the comparative analysis theory. There is no reason why the same is not true here. We do not violate § 2254(d) by considering a theory that rests upon evidence before the state trial judge, even if the state court chose not to review that evidence or consider that theory. See id.

Finally, the district court noted that the trial judge at Reed's Batson hearing stated that he had no independent recollection of the jury selection. The

judge at Miller-El's hearing, while suggesting that he did recall some aspects of the voir dire, also stated that he wished to review the record before ruling. The judge expressed his general agreement with the prosecution's argument but qualified that remark by stating, "I want the same benefit of everything that [the defendant had] talked about and that is to review the records myself." It is not clear why the fact that Miller-El's judge remembered some aspects of jury selection and Reed's judge did not recall any of it should make any difference regarding whether the entire voir dire transcript was before the trial judge. In Miller-El II, the Supreme Court held that the entire voir dire transcript was before the state trial court and that the comparative analysis was one theory that used the evidence. The Court did not hold—as the district court seems to suggest—that the entire voir dire transcript was before the trial judge because the judge could remember some aspects of the voir dire.

In the present case, the district court noted that "Reed's Batson hearing was long after the trial, and . . . Reed's comparative argument was first made long after, and outside the record of, the Batson hearing." This sentence also could describe Miller-El II: Miller-El's Batson hearing occurred two years after his trial,[5] and Miller-El did not make his comparative analysis argument until after his Batson hearing. Accordingly, Miller-El II is directly on point.

In sum, although the TCCA determined here that it would not consider Reed's comparative analysis theory, the entire voir dire transcript did not disappear from the record for purposes of federal habeas review. The comparative analysis rests on the entire voir dire transcript. Miller-El II held that all of the voir dire was part of the "evidence" before the "state courts," even though the defendant did not present the comparative analysis theory and referred only to the voir dire of the challenged jurors. That is, the entire voir

---

[5] There is no support for the district court's conclusion that a two-year delay versus a ten-year delay in having a Batson hearing makes any difference in this analysis.

16

dire transcript was before the state court during the Batson hearing, even if the court chose not to consult it. See 28 U.S.C. § 2254(d)(2) (noting that this court must assess a state court's factual finding "in light of the evidence presented in the State court proceedings"); Miller-El II, 545 U.S. at 241 n.2 (quoting the language from § 2252(d)(2) in concluding that Miller-El had presented the entire voir dire transcript to the state courts even if he did not refer to the comparative analysis theory). Therefore, the entire voir dire transcript—and the comparative analysis, which is a theory that relies upon the voir dire—is properly before this court on habeas review.[6]

C.      Review of Comparative Analysis

        1.      Comparative analysis in Miller-El II

Before we discuss Reed's comparative analysis, we find it useful to recount the Supreme Court's comparative analysis in Miller-El II. The Court described the relevance of the comparative analysis by noting that "[i]f a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at Batson's third step." Miller-El II, 545 U.S. at 241. Although the prosecution in Miller-El's trial struck ten eligible black jurors, the Court focused on two for its comparative analysis. Id. at 242-53. The Court first examined the prosecution's strike of prospective juror Billy Jean Fields ("Fields"). Id. at 242. Fields was a black man who expressed support for the death penalty. Id. The prosecution alleged that it struck Fields because he indicated that the likelihood of rehabilitation might impact his view on the defendant's future dangerousness. Id. The Court compared Fields's

---

[6] The Supreme Court in Miller-El II distinguished between the voir dire, which was before the TCCA as part of the evidence, and the juror questionnaires and information cards, which might not have been before the state courts. 545 U.S. at 241 n.2. The TCCA has made this same distinction. See Vargas, 838 S.W.2d at 557. Out of an abundance of caution—and because it makes no difference to our analysis—we consider only the voir dire transcript.

response on this issue with that of two white jurors who the prosecution accepted, concluding that "when we look for nonblack jurors similarly situated to Fields, we find strong similarities as well as some differences. But the differences seem far from significant, particularly when we read Fields's voir dire testimony in its entirety." Id. at 247 (footnote omitted).

The majority responded to the dissent's assertion that no white panelist was similarly situated to Fields by noting,

> None of our cases announces a rule that no comparison is probative unless the situation of the individuals compared is identical in all respects, and there is no reason to accept one. . . . A per se rule that a defendant cannot win a Batson claim unless there is an exactly identical white juror would leave Batson inoperable; potential jurors are not products of a set of cookie cutters.

Id. at 247 n.6.

The other juror that the Court used for its comparative analysis was Joe Warren ("Warren"). Id. at 247. Warren gave an equivocal answer when he was asked whether he supported the death penalty. Id. at 247-48. The prosecution asserted that it struck Warren because of his inconsistent responses on this issue. Id. at 248. However, the Court found that the State did not object to other panel members who gave responses similar to Warren's, making this explanation implausible. Id. The State also contended that it struck Warren because his brother-in-law had been convicted of a crime, but the Court noted that this criminal history was comparable to those of the relatives of nonblack panel members that the State did not strike. Id. at 250 n.8. Finally, the Court rejected the State's argument that it simply was being more liberal in using a strike against Warren at that point in the process because the State had many peremptory challenges remaining. Id. at 249. In particular, the Court noted that the State accepted a nonblack juror right before it examined Warren and that that nonblack juror had given answers regarding her views of the death

penalty that were similar to Warren's. Id. As the Court concluded, "[i]t is true, of course, that at some points the significance of Miller-El's evidence is open to judgment calls, but when this evidence on the issues raised is viewed cumulatively its direction is too powerful to conclude anything but discrimination." Id. at 265.

The Court's treatment of Miller-El's comparative analysis also reveals several principles to guide us. First, we do not need to compare jurors that exhibit all of the exact same characteristics. Id. at 247 n.6. If the State asserts that it struck a black juror with a particular characteristic, and it also accepted nonblack jurors with that same characteristic, this is evidence that the asserted justification was a pretext for discrimination, even if the two jurors are dissimilar in other respects. Id. at 241. Second, if the State asserts that it was concerned about a particular characteristic but did not engage in meaningful voir dire examination on that subject, then the State's failure to question the juror on that topic is some evidence that the asserted reason was a pretext for discrimination. Id. at 246. Third, we must consider only the State's asserted reasons for striking the black jurors and compare those reasons with its treatment of the nonblack jurors. Id. at 252.

### 2. Comparative analysis for Reed's jury

With respect to the jury selection in Reed's case, we find that the State's proffered reasons for striking at least two of the prospective black jurors were pretexts for discrimination. Our conclusion rests on a careful comparison of the testimony of these jurors with that of nonblack jurors who were similarly situated.

#### a. Gloria Osby

The most obvious example of the implausibility of the State's justifications for its peremptory challenges, given the entire record, is the State's strike of prospective African-American juror Gloria Osby ("Osby"). Osby likely would

have been an ideal juror for the State. She expressed support for the death penalty and viewed a case of murder in the course of committing robbery or attempted rape as the type of case in which she could vote for death. (Transcript of Record at 1-200, 1-203, State v. Reed, No. F 81-1988-PL (Tex. Crim. Dist. Ct. 1983) [hereinafter "Tr."].) She had previously served as the foreperson in a criminal case in which the jury convicted the defendant of theft. (Tr. at 1-209, 210.) She understood the three special issue questions that death penalty jurors must answer and recognized that if the jury answered "yes" to all three, the court was obligated to sentence the defendant to death. (Tr. at 1-238.) She also stated that she would answer the three questions "yes" if the evidence mandated that conclusion, even if she personally felt that death was inappropriate for that defendant. (Tr. at 1-241.)

The State asserted that it struck Osby for two reasons. First, the State argued that it struck her because she was a health care professional and that the State generally disfavored health care workers in cases involving medical evidence. Second, the State asserted that Osby would require a high standard of proof for the future dangerousness special issue.

Regarding Osby's status as a health care professional, the State did not ask Osby any questions about her profession. As the Supreme Court stated, the prosecution's failure to question a potential juror about a characteristic that the State asserts is important is evidence that the asserted reason was actually a pretext for discrimination. See Miller-El II, 545 U.S. at 246 (citing Ex parte Travis, 776 So. 2d 874, 881 (Ala. 2000) ("[T]he State's failure to engage in any meaningful voir dire examination on a subject the State alleges it is concerned about is evidence suggesting that the explanation is a sham and a pretext for discrimination")). Here, the prosecutor merely established that Osby was a registered nurse who worked for the Veterans Administration and had formerly worked with the Dallas Osteopathic Hospital. (Tr. at 1-208.) The prosecutor did

not ask her anything about her background as a health care professional or the type of patients she saw.[7]  The State's failure to question her about her job suggests that this asserted reason for striking Osby was pretextual.[8]  In fact, the prosecution stated, when examining prospective white juror Dale Moler, that "I don't even know why that question [about whether the juror or a juror's relative ever worked in a hospital] is on [the juror questionnaires]." (Tr. at 2-305.)[9]

The State's other justification for striking Osby—her alleged requirement that the State show a "strong possibility" of future dangerousness—is also unavailing.  The only basis for this contention is one sentence from Osby's voir dire testimony.  In response to a question about whether the State would have to prove that the defendant would commit another murder to show a probability of future dangerousness, Osby stated that "it would have to be proven to me that that is a strong possibility." (Tr. at 1-235.)  She then qualified her statement, agreeing with the prosecutor that someone would pose a threat of future dangerousness if the State showed that the defendant likely would commit "an assault of some type or physical harm of some type." (Tr. at 1-235.)  Thus, it is not even clear from Osby's testimony that she would require a "strong possibility" of future dangerousness.

More tellingly, the State accepted several nonblack jurors who expressed a similar sentiment.  White juror William Rhodes ("Rhodes") stated that to him,

---

[7] Reed asked several questions about Osby's profession, learning that she studied nursing at El Centro Junior College and that she worked in the respiratory ward.  (Tr. at 1-274.)

[8] The State did question one black potential juror, Mary Mosley ("Mosley"), on this subject, and she testified that she had previously worked in an emergency room where a patient was on a respirator.  (Tr. at 6-478.)  The court ultimately struck Mosley for cause for an unrelated reason.

[9] Further, although irrelevant to our decision, see supra note 6, we note parenthetically that the State accepted several nonblack jurors who indicated on their juror questionnaires that the juror or a relative of the juror had worked in a hospital.

the word "probability" in the future dangerousness special issue meant "it's not for sure but it's most probable that it would occur again." (Tr. at 2-834.) When pressed further, he stated, "You couldn't say it would be a hundred percent proof, but you could say it would be ninety-five percent proof." (Tr. at 2-835.) There is little difference between this answer and Osby's statement that she would want to see a "strong possibility" of future dangerousness, but the State sought to keep Rhodes on the jury panel, objecting to the defense's challenge of Rhodes for cause. White juror Randolph Hanes ("Hanes") gave an even more unfavorable response for the State regarding the future dangerousness special issue. He stated that in his opinion, "the word probable is too definite. I'm interpreting it as definitely that he would." (Tr. at 3-185.) He then clarified that he believed "probability" of future dangerousness means "close to being definite." (Tr. at 3-187.) This would seem to impose a higher burden on the State then showing a "strong possibility," but the State accepted Hanes. White juror Paul Halliday stated that for the future dangerousness special issue, he would want to see that the defendant's past behavior indicated that "there is a very, very high degree that he would be a threat to society." (Tr. at 5-826.) The State accepted him to serve. In sum, Osby's voir dire testimony, when compared to the testimony of nonblack jurors who gave similar responses, demonstrates that the reasons the State came up with to justify its strike of Osby are spurious.

> b.    Perry Jones

Prospective black juror Perry Jones ("Jones") also likely would have been a strong juror for the State. He favored the death penalty generally, stating that "[a] lot of cases definitely warrant it." (Tr. at 1-588.) He believed that the death penalty deterred crime and disagreed with a moratorium on capital punishment. (Tr. at 1-592, 1-593.) He also said that he could impose the death penalty if the facts and circumstances warranted it. (Tr. at 1-591.)

The State asserted, at the Batson hearing, that it struck Jones for three

22

reasons. First, the State claimed that Jones would impose the death penalty only "if the facts are presented to me beyond a shadow of a doubt," which the State argues is a higher burden of proof than beyond a reasonable doubt. Second, the State argued that Jones would need to see "a little premeditation" to convict for capital murder, which the law in Texas does not require. Finally, the State posited that it struck Jones because he was concerned about losing his job if he was gone from work for a long time. However, a review of Jones's voir dire testimony, along with a comparison of the State's treatment of white jurors who expressed these same sentiments, demonstrates that the State's proffered reasons were pretexts for discrimination.

Jones used the phrase "beyond a shadow of a doubt" in response to a question about his views on the death penalty. The prosecutor asked Jones if he would place himself into one of three categories, the first being a person who believed in the death penalty and could impose it if warranted. (Tr. at 1-589, 1-590.) Jones responded that he agreed with the first category, stating that he could vote for death "[i]f the facts are presented to me in such a way that beyond the shadow of a doubt the man is incapable of being rehabilitated." (Tr. at 1-591.) The prosecution did not ask Jones to explain this statement, even though, as the State argued to the TCCA, Jones's beliefs would cause the State "a serious difficulty in the presentation of its evidence" because this was a "burden of proof far beyond" what the law required. Much like with Osby and her status as a health care professional, the fact that the prosecution failed to question Jones about the "shadow of a doubt" standard, which the State purportedly found important, suggests that this reason was pretextual. See Miller-El II, 545 U.S. at 246. Additionally, the State accepted several white jurors who used this same phrase. For example, when questioning prospective white juror Rhodes, the prosecution asked if he would require the State to prove every item in the indictment beyond a reasonable doubt, and Rhodes responded,

23

"[t]hat's right, beyond the shadow of a doubt at all." (Tr. at 2-875.) The prosecutor repeated Rhodes's statement, affirming that "[i]f you had a shadow of a doubt that we didn't prove it beyond the shadow of a doubt, you would cut him loose." (Tr. at 2-875.) If the prosecution were really concerned about this sentiment, as it asserts it was for Jones, it would have neither used this same phrase nor objected when the defendant challenged Rhodes. Similarly, the State accepted white juror Charlotte Speulda, even though she stated that, to answer "yes" to the future dangerousness question, "the evidence would have to prove that this person had done the crime without any shadow of a doubt." (Tr. at 6-1024.) Prospective white juror J.D. Stacy, who the State accepted, stated, "[i]f I had the slightest doubt, I could not find the person guilty," which the State recognized was beyond the legal standard of "reasonable doubt." (Tr. at 6-890.) In sum, several white jurors expressed that they might hold the State to a higher burden than "beyond a reasonable doubt," but the State accepted these jurors. The State therefore cannot justify its strike of Jones on this basis.

Next, Jones expressed his views on premeditation in response to a question about whether he would want to see premeditation in a capital murder case. (Tr. at 1-640.) Specifically, he stated, "I think that for capital murder that you would have to show a little premeditation." (Tr. at 1-640.) Jones then clarified his statement, saying that he would not require the State to show that the defendant planned out the act beforehand. (Tr. at 1-641.) Instead, he simply wanted to ensure that the defendant knew what he was doing at the time. (Tr. at 1-641.) Thus, contrary to the State's argument, it appears that Jones actually would not have held the State to a higher burden; instead, he simply misunderstood the meaning of premeditation, equating it with intent. Further, white juror John Wood also exhibited confusion regarding the meaning of "premeditated murder," and the State accepted him without probing further to determine what Wood meant by premeditation. (Tr. at 3-284.) This undercuts

24

the State's argument that a jurors' views on premeditation were important. See Miller-EI II, 545 U.S. at 246.

Finally, the State cannot justify its strike of Jones based on Jones's concern about losing his job if he served on the jury. Jones stated that he could not be away from work for a long period of time in January while jury selection was taking place, but he noted that he could return without any problems in February, when the trial was scheduled to begin. (Tr. at 1-575, 1-577.) He specifically averred that he could devote his full attention to the trial in February. (Tr. at 1-654, 1-661.) Thus, the State did not have a legitimate reason to strike Jones on this basis, even without comparing Jones's responses to the responses of white jurors that the State accepted. A comparative analysis confirms that this asserted reason was a pretext for discrimination. Prospective white juror Paul Murray stated that serving on the jury might "bankrupt" him and that he might not be a suitable juror if the case dragged on because he would be worried about his business. (Tr. at 1-482, 1-486, 1-488.) Prospective white juror Rhodes stated that he was self-employed and that his business might suffer if he served on the jury.[10] (Tr. at 2-784.) White juror Sonja Czuwala testified that serving on the jury would be "hard" because she picked up her children in the afternoon. (Tr. at 1-995.) The State did not express any reservations about allowing these white jurors to serve. In contrast, Jones did not express the same level of concern as these jurors, but the State attempted to use this rationale to justify its strike of Jones. E.g., Snyder v. Louisiana, 128 S. Ct. 1203, 1209 (2008) (rejecting State's argument that it struck a prospective black juror because the juror was concerned about completing his student-teaching obligations). Accordingly, the only rational explanation is that the

---

[10] Rhodes and Jones shared two of the characteristics that the State relies upon to justify its strike of Jones—the use of the phrase "shadow of a doubt" and concerns about work—but the State accepted Rhodes and used a peremptory challenge against Jones.

State did not strike Jones because of his work schedule and that this reason was actually a pretext for discrimination.

In sum, a careful examination of the record reveals that the State's asserted reasons for striking prospective black jurors Osby and Jones were mere pretexts for discrimination.[11]   For some of the explanations, the State misconstrued the jurors' testimony.  For others, the State accepted white jurors who exhibited the same characteristics.  As stated above, the black and white jurors that we compare need not be exactly the same for us to conclude that the prosecution's proffered reasons for striking the black prospective jurors were pretexts for discrimination, because "[a] per se rule that a defendant cannot win a Batson claim unless there is an exactly identical white juror would leave Batson inoperable; potential jurors are not products of a set of cookie cutters." Miller-El II, 545 U.S. at 247 n.6.  Much like in Miller-El II, "[c]omparing [these strikes] with the treatment of panel members who expressed similar views supports a view that race was significant in determining who was challenged and who was not."  Id. at 252.  Thus, the comparative analysis demonstrates what was really going on: the prosecution used its peremptory challenges to ensure that African-Americans would not serve on Reed's jury.[12]

---

[11] Although Reed does not raise this argument, we also note that, much like in Miller-El II, the prosecution here gave a "graphic description" of the death penalty to a majority of prospective black jurors and a minority of prospective white jurors.  See Miller-El II, 545 U.S. at 255-56.  The Court responded to this evidence in Miller-El II by concluding that, "[a]s between the State's [non-racial explanation that it used the graphic script for jurors who expressed ambivalence about the death penalty] and Miller-El's racial one, race is much the better, and the reasonable inference is that race was the major consideration when the prosecution chose to follow the graphic script."  Id. at 260.

[12] In Miller-El II, the Court focused on the comparative analysis of two jurors that the State struck, even though the State used peremptory challenges for ten prospective black jurors.  Miller-El II, 545 U.S. at 236, 252 n.11.  The Court noted that the State's treatment of the two jurors it analyzed supported "stronger arguments" of a Batson violation than the State's actions toward the other black jurors.  Id. at 252 n.11.  The same is true here.  Reed asserts that the State struck all five qualified black prospective jurors because of their race.  The State's treatment of Osby and Jones are compelling examples of a Batson violation.  The

## D.    Historical Evidence of Discrimination

Much like in Miller-El II, our decision does not rest solely on the comparative analysis.   In Miller-El II, the Court stated, "[w]e know that for

---

State's strikes of prospective black jurors Mary Gaut ("Gaut") and Beverly Johnson ("Johnson") present closer calls.  Although the State may have been justified in striking Gaut and Johnson because of their inconsistent responses on their views of the death penalty, the State's other justifications for striking these jurors were pretextual.  That is, the State had one justified rationale for striking these black jurors, and even though it did not need any other reasons, the State provided other explanations that are without merit.

For example, the State asserted that it struck Gaut in part because she would not vote "yes" on the future dangerousness special issue without hearing the testimony of a psychiatrist, but a review of the entire voir dire transcript reveals that she never actually expressed this view, instead simply stating a preference for psychiatric evidence. (Tr. at 5-127, 5-132.) The State accepted several white jurors who also expressed a preference for psychiatric testimony.  (Tr. at 2-564 (Juror Lisa Hill); Tr. at 3-971 (Juror William Scanlon).)  The State claims that it also struck Gaut because she was unable to understand the special issue questions, but it accepted several white jurors who expressed the same level of confusion. (Tr. at 5-347 (Juror Robert Jennings); Tr. at 4-437 (Juror David Taylor); Tr. at 5-710 (Juror Paul Wendt).)

Similarly, the State claims that it struck Johnson in part because she would refuse to impose the minimum penalty for murder and had prior experience with the criminal justice system, having been acquitted of a misdemeanor assault.  But several white jurors that the State accepted expressed similar views regarding the minimum penalty for murder (Tr. at 5-598, 5-613 (Juror J.L. Epps); Tr. at 5-219, 5-221 (Juror Paul Powell)), and the State accepted white juror Robert Jennings even though he was serving a deferred adjudication for carrying a prohibited weapon (Tr. at 5-321.).

Finally, the State's strike of Curtis Alberty ("Alberty") does not assist Reed's Batson argument.  Alberty stated that he was opposed to the death penalty and that he did not want to be the one deciding whether a person lived or died.  (Tr. at 4-223, 4-226.)  He said that his opposition to the death penalty was part of his conscience.  (Tr. at 4-239.)  Although he agreed that he would answer the three special issue questions "yes" if the evidence so warranted, he stated that the result would still bother him.  (Tr. at 4-254.)  Reed does not point to any nonblack juror that the State accepted who expressed this same sentiment.  As stated above, however, this fact does not defeat Reed's Batson claim.  In Miller-El II, the Court found a Batson violation based on its analysis of only two of ten black jurors who the State struck. Miller-El II, 545 U.S. at 252 n.11.  The Court stated that there was "no need to go into the[] instances" of the other jurors because the Court was relying on the State's treatment of the two jurors, along with other evidence of racial discrimination in the Dallas County District Attorney's Office.  Id.  Here, we rely on the State's treatment of two of five black jurors and that same historical evidence.  As the Supreme Court stated, "[t]he Constitution forbids striking even a single prospective juror for a discriminatory purpose."  Snyder, 128 S. Ct. at 1208 (quoting United States v. Vasquez-Lopez, 22 F.3d 900, 902 (9th Cir. 1994)).

27

decades leading up to the time this case was tried prosecutors in the Dallas County office had followed a specific policy of systematically excluding blacks from juries . . . ." 545 U.S. at 263. The Court noted that for years, prosecutors had relied upon a manual titled "Jury Selection in a Criminal Case," or the "Sparling Manual," which outlined the reasons for excluding minorities from jury service. Id. at 264 (citing Miller-El I, 537 U.S. at 334-35). The Court concluded, "[i]f anything more is needed for an undeniable explanation of what was going on, history supplies it. The prosecutors took their cues from a 20-year-old manual of tips on jury selection . . . ." Id. at 266.

Here, Reed presents this same historical evidence of racial bias in the Dallas County District Attorney's Office. Miller-El's trial occurred in early 1986. Reed's trial was in February 1983. One of the same lawyers that conducted the voir dire in Miller-El's case, Paul Macaluso, also questioned prospective jurors for Reed's trial. The Court in Miller-El II relied, in part, on the Sparling Manual to glean the history of racial discrimination in the Dallas County District Attorney's Office, and Reed presented this same document at his Batson hearing. The Sparling Manual, written in 1968, directs prosecutors that "[y]ou are not looking for any member of a minority group which may subject him to oppression—they almost always empathize with the accused" and that "[m]inority races almost always empathize with the Defendant." Thus, this document demonstrates that the District Attorney's Office had a policy of striking African-Americans from the jury. Id. at 264. If, as the Court found, that office had a policy of discriminating against black jurors in 1986 during Miller-El's trial, then the reasonable conclusion is that it also had this policy three years earlier during Reed's trial. The Court in Miller-El II relied on historical evidence of racial bias among these prosecutors, and, taking our cues from the Supreme Court, we view this exact same evidence as persuasive here.

In sum, the facts of Miller-El II and the facts here are almost identical.

28

In both cases, the prosecution used its peremptory challenges to strike prospective black jurors. In both cases, the State had accepted several white jurors who exhibited the exact same characteristics as these black jurors. In both cases, the comparative analysis demonstrated that the State's post hoc rationalizations for challenging these jurors were in reality pretexts for discrimination. And in both cases, which occurred within three years of each other and involved one of the same prosecutors, a policy of excluding African-Americans from juries pervaded the Dallas County District Attorney's Office. Given the similarities, and adhering to the lessons from Miller-El III, we conclude that Reed has established a Batson violation. The state court's conclusion to the contrary was an unreasonable determination of the facts before it. Accordingly, Reed is entitled to habeas relief on his Batson claim.

## IV. CONCLUSION

Reed has established that he is entitled to habeas corpus relief based on the Batson error in selecting his jury. Therefore, we need not reach the other three issues on which we originally granted COAs. Although we do not relish adding a new chapter to this unfortunate story more than thirty years after the crime took place, we conclude that the Constitution affords Reed a right to relief. Therefore, we REVERSE and REMAND with instructions to grant the writ, set aside Reed's conviction and sentence, and order Reed's release from custody unless the State grants Reed a new trial within 120 days from the date of the district court's order.

REVERSED AND REMANDED WITH INSTRUCTIONS