# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 17-30191

United States Court of Appeals
Fifth Circuit

**FILED**

May 10, 2018

Lyle W. Cayce
Clerk

AMY HEBERT,

> Petitioner - Appellant

v.

JAMES ROGERS, WARDEN, LOUISIANA CORRECTIONAL INSTITUTE
FOR WOMEN,

> Respondent - Appellee

Appeal from the United States District Court
for the Eastern District of Louisiana

Before STEWART, Chief Judge, and CLEMENT and SOUTHWICK, Circuit
Judges.

EDITH BROWN CLEMENT, Circuit Judge:

This habeas case is about a woman who, awaking in the night to an alleged voice telling her to kill her children, grabbed several kitchen knives and repeatedly stabbed her young children, leaving them to bleed to death. Upon being charged with first degree murder, she pled not guilty by reason of insanity. The jury found her guilty but did not sentence her to death. After exhausting all forms of direct or collateral relief in Louisiana, Amy Hebert filed a petition for habeas relief in federal court. The district court denied relief but granted a certificate of appealability. Hebert raises two issues before us: (1)

No. 17-30191

defense counsel provided ineffective assistance by failing to object to the State's allegedly discriminatory peremptory strikes; and (2) a rational jury could not have found that Hebert was sane at the time of the killings. We affirm.

## Facts and Proceedings

Amy Hebert had two children, a nine-year old girl named Camille and a seven-year old boy named Braxton. In 2005, Hebert and her husband, Chad, separated. In 2006, they divorced after she learned about Chad's affair with a woman from work, Kimberly. Over the next year, Chad's relationship with Kimberly became more serious, and they started to plan a wedding, which was set for 2008. The children also had been developing a closer relationship with Kimberly, a fact that Hebert observed and resented. Chad began building a new home, where both children would have their own room.

In the late summer of 2007, Hebert stabbed both of her children to death at their home in Matthews, Louisiana. Both children suffered dozens of stabs wounds in the chest, back, and scalp, and ultimately bled to death. After killing both children, Hebert placed their bodies in her bed. She then killed the family dog, made a pot of coffee, wrote two notes, and attempted to take her own life. She slashed her wrists until she exposed her tendons; punctured her lungs, collapsing them; and inflicted cuts to her legs, skull, neck, and eyelids. Then, Hebert lay down in her bed to die beside her children.

Hebert's former father-in-law discovered this grisly scene the next morning, and he summoned the police. When the authorities arrived and entered the master bedroom, Hebert lifted a large knife and yelled, "Get the f--- out." The police subdued her with a taser. The authorities' attempts to resuscitate the children were unsuccessful. Hebert was taken to the hospital.

The police discovered the two notes that Hebert had written. The first note was addressed to Chad. It stated:

2

No. 17-30191

Monday 8-20-07

Chad,
You wanted your own life. You got it. I'll be damned if you get the kids, too. Your ambition & greed for money won out over your love for your family. The hell you put us through & I do mean all of us because you don't know what the kids used to go through because of course you weren't here.  This is no kind of life for them to live. I sure hope you two lying alduttering [sic] home wrecking whores can have more kids because you can't have these.  Actually I hope you can't because then you'll only produce more lying homewrecking adultering [sic] whores like yourselves.  Maybe you can buy some with all of your money you will make from this house & the life insurance benefits you'll get from the kids.

The second note, which was addressed to Hebert's former mother-in-law, stated:

Monday 8-20-07

Judy,
You run from the very thing you support! Monica pairs up with a married man, becomes a kept woman & your response is maybe she is in love with him—so that makes it okay? How stupid! Your sons have affairs bring these whores home & you welcome them all in. I guess its okay for them to hurt the family as long as it is not you. Well when you started delivering my kids to that whore, Kimberly, that was the last straw! To all my friends thanks for all the help & support you tried to give me. I love you all,
Sorry Daddy, Celeste & Renee I love you all too.

Upon her arrival at the hospital, Hebert received treatment for her physical wounds along with mental treatment from Dr. Alexandra Phillips, a psychiatrist. Initially, Hebert was unresponsive. A few days after the children's deaths, Hebert informed Dr. Phillips that she had been hearing "the words of Satan for a long time." In response to a question from Dr. Phillips, Hebert said that "Satan was in the room and was laughing at her." Hebert then proceeded to scream, and Dr. Phillips concluded that Hebert was "completely psychotic" and prescribed anti-psychotic medicine for her.

3

No. 17-30191

The State of Louisiana charged Hebert with first-degree murder of her children. Hebert pled not guilty by reason of insanity. A trial was held in Lafourche Parish, Louisiana.

The jury venire comprised 200 people, 112 of whom were women. Both parties received 12 peremptory strikes and two alternate juror peremptory strikes. Before the final jury was selected, 23 women and 10 men were randomly selected to sit on the jury. The court struck four men for cause or hardship, and Hebert used four peremptory strikes on men, which left just two men on the panel. The State used 11 peremptory strikes and one alternate peremptory strike against women. Hebert's counsel did not object. The final jury included 10 women and two men, together with three men and one woman as alternate jurors.

The jury heard testimony from six experts during the guilt phase of the trial. The defense called four experts: Dr. Alexandra Phillips, Dr. David Self, Dr. Glenn Ahava, and Dr. Phillip Resnick. Dr. Phillips prescribed anti-psychotic medication for Hebert after concluding that she was "completely psychotic" when she claimed that she saw and heard Satan in the hospital room. Dr. Resnick opined that Hebert was psychotic[1] when she killed her children because she was having auditory hallucinations in which she heard the voice of Satan commanding her to kill the children and then commit suicide to keep the family together. The voice, according to Hebert, then instructed her to write the notes left at the scene of the crime. Dr. Ahava, an expert in forensic psychology, testified that Hebert was psychotic and likely could not distinguish right from wrong on the day of the offense based on her history of mental health problems and the excessive number of stabs wounds on the children. Dr. Self, an expert in forensic psychiatry, diagnosed Hebert as suffering from major

---

[1] Dr. Resnick defined "psychosis" as being out of touch with reality.

depression with recurrent and severe psychosis. He further concluded that Hebert must have been psychotic because "only the most psychotic people attack their own eyes."

In response, the State called two rebuttal experts: Dr. Rafael Salcedo and Dr. George Seiden. Dr. Salcedo, an expert in clinical and forensic psychology, conceded at trial that Hebert suffered from a psychotic disorder but concluded that Hebert was still able to distinguish right from wrong. In reaching this conclusion, Dr. Salcedo relied on Hebert's notes, which he opined revealed the logical mental process of someone seeking revenge through a retribution killing. Dr. Seiden, an expert in general and forensic psychiatry, opined that Hebert was capable of telling right from wrong because there was no evidence that Hebert exhibited psychosis before killing her children. He also relied on the notes as evidence of Hebert's mental state, and he opined that the line "Sorry Daddy, Celeste & Renee" showed Hebert understood the wrongfulness of her actions.

The jury returned a verdict of guilty. The jury was unable to reach a unanimous verdict on the death penalty, and the court sentenced Hebert to life imprisonment. Hebert filed a direct appeal to the Louisiana First Circuit Court of Appeals, which affirmed her conviction and sentence. Hebert then unsuccessfully pursued habeas relief in state court. In response to a claim that its peremptory strikes discriminated against women, the State provided gender-neutral reasons for using its peremptory strikes. After exhausting all other avenues of relief, Hebert filed a habeas corpus petition in the United States District Court for the Eastern District of Louisiana. The district court denied her petition for relief, but it granted a COA on all issues raised. Hebert timely appealed.

No. 17-30191

## Standard of Review

The Antiterrorism and Effective Death Penalty Act ("AEDPA") prohibits a federal court from granting habeas relief unless the decision of the state court "(1) . . . was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or (2) . . . was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d). A state court's decision is contrary to clearly established precedent if the rule it applies "contradicts the governing law set forth in the [Supreme Court's] cases," or if the state court confronts facts that are materially indistinguishable from a decision of the Supreme Court yet reaches a different result. *Wooten v. Thaler*, 598 F.3d 215, 218 (5th Cir. 2010) (quoting *Wallace v. Quarterman*, 516 F.3d 351, 354 (5th Cir. 2008)). A state court commits an unreasonable application of Supreme Court precedent if it identifies the correct legal rule but unreasonably applies that rule to the facts. *Id.* (citing *Williams v. Taylor*, 529 U.S. 362, 407 (2007)).

"Determining whether a state court's decision resulted from an unreasonable legal or factual conclusion does not require that there be an opinion from the state court explaining the state court's reasoning." *Harrington v. Richter*, 562 U.S. 86, 98 (2011). A state court's decision does not even "require awareness of [the Supreme Court's] cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early v. Packer*, 537 U.S. 3, 8 (2002).

In an appeal from the denial of habeas relief, we review legal conclusions de novo and factual findings for clear error. *Perez v. Cain*, 529 F.3d 588, 593 (5th Cir. 2008). We presume the state court's factual findings are correct unless rebutted by the petitioner with clear and convincing evidence. *Wooten*, 598 F.3d at 218.

6

No. 17-30191

**Discussion**

I. Ineffective Assistance of Counsel

Hebert argues that her counsel provided ineffective assistance because he failed to object to the State's use of its peremptory strikes against qualified female venire members in a manner that she alleges was discriminatory. We apply the legal standard articulated in *Strickland v. Washington* when evaluating the effectiveness of Hebert's trial counsel. 466 U.S. 668 (1984). Under *Strickland*, a petitioner must prove both deficient performance and prejudice. 466 U.S. at 697. To prove deficient performance, petitioner must show that her counsel's performance "fell below an objective standard of reasonableness." *Id.* at 688. For prejudice, petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. The issue is whether defense counsel's representation "amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom." *Harrington v. Richter*, 562 U.S. 86, 105 (2011) (quoting *Strickland*, 466 U.S. at 690)).

In the habeas context, attorney performance is scrutinized under a "doubly" deferential standard. *Id.* (quoting *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)). There is a strong presumption that defense counsel's strategic and tactical decisions fell "within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689. "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* Even if the petitioner proves deficient performance, prejudice is not presumed. *See Virgil v. Dretke*, 446 F.3d 598, 607 (5th Cir. 2006).

No. 17-30191

The Equal Protection Clause prohibits a prosecutor from intentionally discriminating against a potential juror based on race or gender. *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 129 (1994) (prohibiting discrimination in jury selection based on gender); *Batson v. Kentucky*, 476 U.S. 79, 86 (1991) (prohibiting discrimination in jury selection based on race). Hebert contends that her counsel's failure to object amounted to deficient performance that prejudiced her because the State's alleged intentional discrimination undermined the confidence in the proceedings and caused structural error. If Hebert fails to show that a *J.E.B.* violation occurred, however, then she also fails to show that her attorney's performance was deficient or that she was prejudiced thereby.

Hebert raised her allegation of ineffective assistance of counsel for failing to object to gender discrimination on state post-conviction review. The state trial court denied her claim without performing an analysis under *J.E.B. v. Alabama ex rel. T.B.*, instead simply citing the State's proffered gender-neutral explanations for striking the female jury members:

> Of the jurors stricken, there were many sufficiently gender-neutral explanations for the use of peremptory challenges including: religious, moral or ethical considerations, self-employed business owners, jurors with medical or psychiatric problems, jurors with family members that had psychiatric problems, one juror who knew the defendant, and those jurors that had misgivings about imposing the death penalty.

The state court concluded that "[t]he record in this matter reflects that petitioner's counsel used their experience and training in the most skillful manner to properly defend petitioner against the charges." The Louisiana Supreme Court adopted the trial court's reasons when denying Hebert's petition.

Acknowledging that the state court addressed her ineffective assistance of counsel claim on the merits, Hebert contends that it—and the district

8

court—failed to articulate the *J.E.B.* legal framework, failed to consider relevant facts, and unreasonably applied the law and facts. As previously noted, a state court's decision does not need to be thorough or directly address Supreme Court's cases, "so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early*, 537 U.S. at 8. Thus, the brevity of a state court's opinion is immaterial.

To determine whether the reasoning and result of the state court's opinion comport with Supreme Court precedent, we undertake the *J.E.B.* analysis as it is relevant to Hebert's ineffective assistance of counsel claim. The *J.E.B.* framework employs the same analysis as a *Batson* claim. *See J.E.B.*, 511 U.S. at 144. The petitioner must present a prima facie case that the state discriminated on the basis of gender during the jury selection. *See Reed v. Quarterman*, 555 F.3d 364, 368 (5th Cir. 2009). This step becomes "moot," however, "[o]nce a prosecutor has offered a [gender]-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination[.]" *Hernandez v. New York*, 500 U.S. 352, 359 (1991). If the State articulates a gender-neutral reason for striking the jurors in question, the court must determine if the petitioner has met her burden to prove purposeful discrimination. *See Reed*, 555 F.3d at 368. "[A] finding of pretext as to a single juror requires that a conviction be vacated . . . ." *Murphy v. Dretke*, 416 F.3d 427, 434 (5th Cir. 2005).

Hebert argues that the State violated her constitutional rights when it exclusively used its peremptory strikes to remove qualified women from the jury. In support of this argument, Hebert observes that the State used 11 of its primary peremptory strikes against women and then used one of its alternate peremptory strikes against another woman. Hebert then concludes that the State acted discriminatorily because 100% of the peremptory strikes used by the State were against qualified women.

No. 17-30191

Of all the venire members randomly selected before a final jury was chosen, there were only two men left on the jury after four men were dismissed for cause and Hebert struck the other four men with her peremptory strikes. Thus, as the district court noted, the State's strikes against qualified women is hardly surprising or alarming. The State also provided gender-neutral reasons for its strikes, and thus the initial step requiring proof of a prima facie case is moot. *See Hernandez*, 500 U.S. at 359.

When the State offered gender-neutral reasons for its strikes, the primary question became whether the reasons were plausible. *See Miller-El v. Cockrell*, 537 U.S. 322, 338–39 (2003); *Miller-El v. Dretke*, 545 U.S. 231, 252 (2005) ("*Miller-El II*") ("[A] prosecutor simply has got to state his reasons as best he can and stand or fall on the plausibility of the reasons he gives."). At the third step of the *J.E.B./Batson* analysis, courts consider whether the State's "proffered reason for striking a [female] panelist applies just as well to an otherwise-similar [male] who is permitted to serve [because] that is evidence tending to prove purposeful discrimination." *Miller-El II*, 545 U.S. at 241. In *Miller-El II*, the Supreme Court held that the state used its peremptory strikes in a racially discriminatory manner when the state struck black jurors for reasons that applied equally well to white jurors retained on the jury. *See* 545 U.S. at 266. The Court also found it significant that the final jury only included one black juror: "[t]he numbers describing the prosecution's use of peremptories are remarkable. Out of 20 black members of the 108–person venire panel for Miller-El's trial, only 1 served. Although 9 were excused for cause or by agreement, 10 were peremptorily struck by the prosecution." *Id.* at 240–41.

We have previously drawn three principles from the Supreme Court's analysis in *Miller-El II. Reed*, 555 F.3d at 376. First, the struck juror and the comparator-juror do not need to "exhibit *all* of the exact same characteristics."

No. 17-30191

*Id.* Second, if the state presents a particular reason for striking a juror without "engag[ing] in meaningful *voir dire* examination on that subject," that is "some evidence" that the asserted reason for the strike was pretext for discrimination. *Id.* Third, we must confine our inquiry to the reasons provided by the state for its strikes. *Id.*

Hebert argues that "the preemptively offered gender-neutral reasons provided by the State were demonstrably implausible." She specifically identifies the following female potential jurors as examples where the State discriminated based on gender: J.L., M.M., H.P., E.U., F.R., A.O., C.L., and T.F. She compares these women to B.J., J.O., and T.G.—three men who sat on the final jury.

During *voir dire*, the State asked each member of the venire to rate their views on the death penalty using a 1-5 scale. The prosecutor described how this 1-5 scale worked: "[1], death is the only appropriate sentence for first degree murder. [2], you favor death but can impose life. [3], you're equally open to either. [4], you favor life but could impose death. And, [5], life is the only appropriate sentence for first degree murder." To help view the relevant individuals' answers to this question side-by-side, here is a chart:

| | PERSON | DEATH PENALTY | REASON FOR STRIKE |
|---|---|---|---|
| **WOMEN** | J.L. | 4, favored life | bipolar, suffered depression |
| | M.M. | 4, favored life | brother was schizophrenic |
| | H.P. | 4, favored life | believed Hebert mentally ill |
| | E.U. | 4, favored life | sympathetic to mental illness |
| | F.R. | 3, neutral | more friendly with defense |
| | A.O. | 3, neutral | more friendly with defense |
| | C.L. | 4, favored life | strongly opposed death penalty |
| | T.F. | 4, favored life | concerned about mental illness |
| **MEN** | B.J. | 2, favored death | served as an alternate juror |
| | J.O. | 4, favored life | served on the jury |
| | T.G. | 3, neutral | served on the jury |

While a comparator-juror is not required to be identical in all regards, the comparator-juror must be similar in the relevant characteristics. Hebert argues that male juror B.J. "had moral objections to imposing the death penalty, and he was never rehabilitated by the State." It is true that, in his questionnaire, B.J. indicated a moral opposition to the death penalty. But the State asked him about this during *voir dire*. In response to the State's questioning, B.J. admitted he had misunderstood the questionnaire because he actually favors the death penalty. ("I guess I understood it the opposite way.") Furthermore, when asked during *voir dire* about his views on the death penalty, B.J. said "correct" to the statement that he "favor[ed] imposing the death penalty but [he] could consider life." This directly contradicts Hebert's argument that B.J. was not rehabilitated. As someone who favored the death penalty, B.J. was an ideal juror for the State.

More importantly for the issue presented on appeal, B.J. was not a proper comparator for the women struck from the jury because he favored the death penalty, unlike all of the women struck from the jury panel who indicated they were either neutral or against it. Thus, the comparison to B.J. is not valid because he is dissimilar to all the women on perhaps the most important factual point, views on the death penalty.

Hebert's comparison to male juror J.O. is similarly unpersuasive. Hebert argues that J.O. indicated that he could not impose the death penalty on his questionnaire and in his *voir dire* answers. Near the end of the *voir dire* questioning, however, J.O. admitted in response to a question about whether he could impose the death penalty that "[i]n the most extenuating circumstances, I could, if it came down to it, but I do favor life."

More importantly, J.O. is also distinguishable as a comparator in light of another highly relevant fact. Unlike all of the women who were struck from the panel, the State had a personal connection to J.O. because his aunt was an

Assistant District Attorney, a fact disclosed and explored during *voir dire.* Thus, the comparison to J.O. is also not appropriate because he is factually distinguishable on a highly relevant characteristic from the women who were struck from the panel.

That leaves T.G. as the only remaining male comparator-juror identified by Hebert. T.G. indicated that he was neutral on the death penalty. From among the women that Hebert identified as victims of gender discrimination, F.R. and A.O. were the only ones who were neutral on the death penalty. All the other women favored life over death. Thus, T.G. is not a valid comparator to those women.

This leaves two remaining potential comparisons: T.G. to F.R. and A.O. The State claims that it struck F.R. and A.O. because they seemed friendlier with defense counsel. Unless pretext for gender or racial discrimination, this is a completely valid basis for exercising a peremptory strike because "a prosecutor ordinarily is entitled to exercise permitted peremptory challenges 'for any reason at all, as long as that reason is related to his view concerning the outcome' of the case to be tried." *Batson*, 476 U.S. at 89 (quoting *United States v. Robinson*, 421 F. Supp. 467, 473 (D. Conn. 1976)). Hebert does not identify any man on the jury with the characteristic of being friendlier to defense counsel than the State. Accordingly, Hebert does not show that T.G. is an adequate comparator for any of the women the state struck.

We conclude that Hebert has not met her burden to prove that the State used its peremptory strikes with the intent to discriminate against women in violation of *J.E.B.* Without showing a violation of *J.E.B.*, Hebert has failed to show that her attorney's representation was prejudicial when he did not object to the State's use of its peremptory strikes. Yet, even if Hebert could show prejudice, she fails to show that her attorney's representation was incompetent or objectively unreasonable. On appeal, Hebert acknowledges that "the State's

delay in using all of its strikes made it more difficult to decipher that the strikes were not supported by legitimate reasons." This acknowledgement supports the conclusion that her counsel provided effective assistance. Although the state court did not mention *J.E.B.* in its analysis of her claim, its rejection of her ineffective assistance of counsel claim was not contrary to Supreme Court precedent and was not objectively unreasonable. The district court was correct to deny habeas relief on this ground.

## II. Insanity

Hebert claims that she overcame the presumption that she was sane so convincingly that that no rational jury could have found her guilty. In Louisiana, there is a rebuttable presumption that the defendant is sane at the time the offense is committed. *State v. Roy*, 395 So. 2d 664, 665 (La. 1981); *see also Perez v. Cain*, 529 F.3d 588, 594 (5th Cir. 2008). The defendant may rebut this presumption by proving insanity by a preponderance of the evidence. LA. CODE CRIM. PROC. ANN. ART. 652. The test for insanity is whether a mental disease or defect has made the defendant "incapable of distinguishing between right and wrong with reference to the conduct in question." LA. STAT. ANN. § 14:14. Although the state is not required to prove sanity in all criminal cases, the state must prove all essential elements of the crime beyond a reasonable doubt. *See Jackson v. Virginia*, 443 U.S. 307, 324 (1979) (holding that evidence is insufficient and a habeas applicant is entitled to relief if no rational trier of fact could have found proof of guilt beyond a reasonable doubt); *Roy*, 395 So. 2d at 665.

As we have previously held, "the question under the *Jackson* sufficiency standard is whether . . . any rational trier of fact could have found beyond a reasonable doubt that [the defendant] did not prove by a preponderance of the evidence that he was insane at the time of the offense." *Perez*, 529 F.3d at 594 (emphasis added). Moreover, under our precedent, "[t]he credibility of the

14

witnesses and the weight of the evidence is the exclusive province of the jury." *United States v. Garcia*, 995 F.2d 556, 561 (5th Cir. 1993). Hebert acknowledges on appeal that "the state court correctly identified the general legal standard,"[2] but she contends that the state court's "application of the preponderance standard to the facts of this case was unreasonable." We disagree.

Hebert argues that no rational juror could have found beyond a reasonable doubt that she failed to prove insanity by a preponderance of the evidence because she presented twice as many experts as the State, and there was more than enough evidence from those experts for the jury to conclude she was insane. She further argues that the factual basis the State's experts relied upon was incomplete. She contends that "[i]f a suicidal and clinically depressed person's belief that two children with promising futures would be *better off* dead does not represent an 'inability to distinguish right from wrong due to mental disease or defect,' then legal insanity under Louisiana law has little meaning at all."

The State responds that the evidence was sufficient for a rational juror to find that Hebert failed to prove by a preponderance of evidence that she was insane. Contending that this court cannot sit as a "thirteenth juror," the State

---

[2] The district court phrased the inquiry as being whether "any rational trier of fact could have found that Hebert had not proven by a preponderance of the evidence that she was insane at the time of the offense" with all evidence viewed in the light most favorable to the state. This interpretation conflicts with our precedent stating that "the question under the *Jackson* sufficiency standard is whether . . . any rational trier of fact could have found *beyond a reasonable doubt* that [the defendant] did not prove by a preponderance of the evidence that he was insane at the time of the offense." *Perez*, 529 F.3d at 594 (emphasis added). The key point missing from the district court's opinion is that the entire inquiry requires proof that the evidence of sanity was "beyond a reasonable doubt." We owe no deference to the district court's misstatement of the state court's articulation of the legal standard.

argues this court should not "substitute [its] analysis of the evidence for that of the jury."

The leading case in our circuit on this issue is *Perez v. Cain.* 529 F.3d 588 (5th Cir. 2008). There, all of the experts to testify agreed that the defendant was insane, yet the jury disregarded the expert testimony and found the defendant guilty, a verdict that was affirmed on appeal. *Id.* at 595. We held that the state court's conclusion that a rational jury could have found the defendant was sane despite unanimous expert testimony to the contrary was an "objectively unreasonable application of federal law." *Id.* at 599. In reaching that holding, we analyzed whether there was any objective reason for the jury to reject the expert testimony. *Id.* at 595. The expert testimony could have been rebutted with evidence that the expert's factual assumptions were incorrect, the reasoning was inadequate, the expert had an interest or bias, the opinion was inconsistent or contradictory, or there was contrary expert testimony. *Id.* Yet, the state did not offer anything to rebut the unanimous expert testimony, and thus there was no objective reason for the jury to reject the expert testimony. *Id.* at 597.

*Perez* stands for the proposition that a rational jury cannot reject unanimous expert testimony if there is no objective reason to reject it. It does not follow from this holding, of course, that—when the jury had objective reasons to reject expert testimony—a federal habeas court may discard the findings of the jury merely because it disagrees with the jury's conclusion. *Weeks v. Scott*, 55 F.3d 1059, 1063 (5th Cir. 1995) ("[D]ifferences in opinion go to the weight of the evidence . . . and such disputes are within the province of the jury to resolve.").

After reviewing the record, we conclude that the jury had objective reasons to reject the expert testimony from the four defense experts. A rational juror could have found the testimony of Dr. Salcedo and Dr. Seiden, the State's

expert witnesses, to be more credible. That determination, as we stated in *Garcia*, is the exclusive province of the jury and should not be disturbed on appeal. 995 F.2d at 561.

The jury also could have found that the factual assumptions underlying the defense experts' opinions were inadequate. For example, Dr. Phillips admitted that she reached her opinion without knowing about Hebert's religious beliefs. Furthermore, there is evidence in the record and argument on appeal that Hebert's statement about hearing Satan was fabricated and self-serving. The record indicates that Hebert did not mention hearing a voice tell her to kill her children until several weeks after the killings. Hebert also did not initially "ascribe an identity to th[e] voice" and only concluded retrospectively that it must have been Satan that spoke to her that night. At trial, the prosecution argued in closing that Hebert lied about hearing Satan when she killed her children. This evidence and argument provided the jury with an objective reason to conclude that Hebert was sane when she killed her children.

Dr. Resnick testified that Hebert was insane, in part, because the number of stab wounds on the children was excessive, but he admitted that there was no evidence that Hebert continued to stab the children after they died. The trial record also indicates that Hebert went into the children's room twice and was unable to stab them, which the jury could have found as evidence that Hebert knew her actions were wrong. The jury could have found that the defense experts improperly dismissed the significance of the notes Hebert wrote and the indications from those notes that Hebert knew her actions were wrong. The jury also could have found it significant that there was no evidence Hebert was psychotic prior to when she killed the children, a fact at least one of the defense experts acknowledged in his testimony. ("Q. But you've not seen anything in any medical records where prior to August, 20, 2007, defendant

was diagnosed as being psychotic? A. That's correct.") The jury could have understood Dr. Resnick as testifying that Hebert had only had one auditory hallucination—the night she killed her children—and found that her theory of insanity was implausible given the rest of the record.

Dr. Ahava, another expert for the defense, testified that a "central" factual basis for his opinion was information Hebert provided. The jury could have found that Dr. Ahava relied too much on Hebert's characterization of the facts, which may have been skewed because she had been charged with first degree murder at the time she relayed those facts to him. For example, he relied on Hebert's statement that she had a history of mental issues to conclude that she was psychotic when she killed her children. But he also admitted that there were no records of mental health providers treating Hebert for mental health problems from twenty years prior, as she originally claimed.

Dr. Self, also a defense expert, admitted that it gave him pause when Hebert told him that she had never had any hallucinations before the night she killed her children. Although Dr. Self. followed up on that admission with an explanation, a juror could have found that it seemed implausible for a person who had never previously had a hallucination to suddenly have one on such a tragic night. Dr. Self admitted that a factual basis for his opinion was Hebert's own statements about her history of depression, which could have led a juror to disregard Dr. Self's opinion because it was based on a self-serving factual basis provided by Hebert. Dr. Self also stated that Hebert's weight loss from July to August 2007 indicated a major depression, but her medical records indicated that her weight remained nearly the same throughout that entire period. Although the record does show that the night Hebert killed her children and attempted suicide she weighed about twenty pounds less than her last previous medically-observed weight, a juror could have found that Hebert's weight loss was more likely from a loss of blood than major depression.

No. 17-30191

In sum, this case is distinguishable from *Perez*, where there was no objective reason to disregard the expert testimony. 529 F.3d at 593–95. Here, there is contradictory expert testimony from the State. Furthermore, the factual basis for the defense experts' testimony is arguably unreliable, and there are arguably inconsistencies in some of the opinions expressed. Any of these could have served a rational juror as an objective reason to disregard the testimony of the defense experts and find beyond a reasonable doubt that Hebert failed to prove she was insane by a preponderance of the evidence. Thus, the state court's decision was not an objectively unreasonable application of the law, and habeas relief is not warranted on this ground.

## Conclusion

For the reasons stated above, we AFFIRM the district court.

No. 17-30191

CARL E. STEWART, Chief Judge, specially concurring:

The majority opinion accurately identifies the two issues before us on appeal: (1) whether Hebert received ineffective assistance of counsel; and (2) whether the evidence sufficiently supported the jury's finding that Hebert was not insane. I agree with the majority opinion's well-reasoned analysis regarding Hebert's insanity claim. However, I write separately to express my view that the Antiterrorism and Effective Death Penalty Act ("AEDPA") and the record support a different ineffective assistance of counsel analysis.

The majority opinion concluded that Hebert's counsel's performance was not deficient. However, before doing so, it conducted a comparative juror analysis to determine that the State did not discriminate in using all of its peremptory strikes against women. Using the reasons the State proffered five years after voir dire in its response to Hebert's post-conviction *Strickland* claim, the majority opinion holds that Hebert failed to prove intentional discrimination because there were sufficient differing characteristics to render the men who served as jurors as inadequate comparators to the stricken women. These reasons were not a part of the trial record because Hebert did not object to the State's strikes at voir dire. As a result, the State did not have the opportunity to provide a contemporaneous nondiscriminatory explanation. Instead, it offered the reasons five years later when Hebert first raised ineffective assistance of counsel in her application for post-conviction relief, arguing a *Batson* violation as the basis.

Without thoroughly analyzing the substance of her discrimination argument, the state court found that Hebert's ineffective assistance of counsel claim should be denied because her counsel's performance was not unconstitutionally deficient. Instead of evaluating whether this decision was an erroneous application of the law or was based on an erroneous

20

No. 17-30191

determination of the facts, the majority opinion undertakes a *J.E.B./Batson* analysis because it is "relevant." I, however, would follow the path AEDPA requires of us and evaluate the actions of the state court without conducting a *Batson* analysis because the State's nondiscriminatory explanations were proffered five years after voir dire and because the state court correctly determined the substantive claim: Hebert's counsel was not ineffective.

I.

After her conviction on May 14, 2009, Hebert unsuccessfully filed a direct appeal with the Louisiana First Circuit Court of Appeal. *State v. Hebert*, No. 2010-KA-0305, 2011 WL 2119755, *1 (La. App. 1st Cir. Feb. 2, 2011). The Louisiana Supreme Court denied her cert petition without opinion. *State v. Hebert*, No. 2011-K-0864, 73 So. 3d 380 (La. 2011). Hebert then filed an application for post-conviction relief on January 16, 2013, claiming for the first time that her trial counsel was ineffective for failing to make an objection to the state's use of its peremptory challenges under *Batson v. Kentucky*, 476 U.S. 79 (1986). The trial court ordered the State to file an answer to Hebert's habeas application. It was in this answer, filed September 12, 2014, that the State—more than five years after voir dire—proffered explanations for only using its strikes against women.

Following a hearing, the state trial court found "there were many sufficiently gender-neutral explanations for the use of peremptory challenges . . . ." Ultimately, the trial court determined Hebert's claim had no merit because the record showed her "counsel used their experience and training in the most skillful manner to properly defend [her] against the charges." Hebert sought writ of review which was denied without written opinion by the Louisiana First Circuit Court of Appeal. *State v. Hebert*, No. 2015-KW-0289, 2015 La. App. Lexis 783, at *1 (La. App. 1st Cir. April 20, 2015). In the last-reasoned state

21

court opinion, the Louisiana Supreme Court denied Hebert's claim because she "fail[ed] to show she received ineffective assistance of trial counsel." *State v. Hebert*, No. 2015-KP-0965, 182 So. 3d 23, 23 (La. 2015).   In a well-reasoned opinion that accorded AEDPA deference to the state court decision, the magistrate judge conducted an analysis under *Strickland v. Washington*, 466 U.S. 668 (1984), to find Hebert's ineffective assistance claim was undermined by the record and she failed to make a prima facie showing of intentional discrimination. *Hebert v. Rogers*, No. 15-cv-4950-LMA, 2016 WL 8291110, at *14–16 (E.D. La. Nov. 10, 2016). The district court adopted the report and recommendations. Hebert appealed.

## II.

A federal habeas court cannot disturb a state court's decision denying habeas relief unless the state court's adjudication of the claim

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal  law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). This court does "not function as a superior state court, reviewing challenges to convictions as if we were part of the state appellate review system." *Woodfox v. Cain*, 609 F.3d 774, 818 (5th Cir. 2010) (Southwick, J., dissenting). Our responsibility at this level is to evaluate "not whether [we] believe[] the state court's determination was incorrect but whether that determination was unreasonable." *Chamberlin v. Fisher*, 885 F.3d 832, 837 (5th Cir. 2018) (en banc).

In order to prevail on a claim for ineffective assistance of counsel, a party must prove—by a preponderance of the evidence—her counsel performed

deficiently and that deficient performance caused her prejudice. *See Strickland*, 466 U.S. at 687; *see also Montoya v. Johnson*, 226 F.3d 399, 408 (5th Cir. 2000). To prevail on deficient performance, petitioner "must show that counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688. Our "scrutiny of counsel's performance must be highly deferential." *Id.* at 689.  We must indulge and petitioner must rebut "a strong presumption that counsel's conduct falls within the wide range of professional assistance." *See id.* To prevail on prejudice, petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. The petitioner must prove there is a substantial likelihood of a different result. *See Harington v. Richer*, 562 U.S. 86, 112 (2011). Because *Strickland* is a conjunctive test, petitioner must prove both deficient performance and prejudice. *See Amos v. Scott*, 61 F.3d 333, 348 (5th Cir. 1995). Failure to prove either is fatal. *See id.* Thus, a court may dispose of a claim if the petitioner fails to meet either prong. *Id.*

### III.

The state court did not conduct a *Batson* analysis. It instead disposed of Hebert's substantive claim employing the *Strickland* framework and determining her counsel's performance was not deficient. This was a reasonable application of *Strickland*. As determined by the state court, Hebert's claim has no merit because her counsel's decision not to object was not marred by incompetence so serious she was effectively denied her Sixth Amendment right to counsel. *See Strickland*, 466 U.S. at 687. Hebert failed to overcome the "presumption that, under the circumstances, the challenged action 'might be considered sound strategy.'" *Id.* at 689 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)). This determination is supported by the

No. 17-30191

record. As the magistrate judge pointed out, many of the women who the State allegedly struck because they were women also could have been seen as undesirable jurors by her counsel. Hebert's side-by-side comparison illustrated that some of the women who were stricken were more supportive of the death penalty than the men who were seated. This illustrates that Hebert's counsel did not necessarily fail to object because they were incompetent, but they could have strategically chosen not to object to avoid the death penalty. The jury voted unanimously to convict but could not agree to sentence Hebert to death. Given the requirement to be "doubly deferential" to both the trial counsel's strategic decisions and the state court's determinations, *Burt v. Titlow*, 571 U.S. 12, 15 (2013),  the state court did not act unreasonably when it rejected Hebert's ineffective assistance of counsel claim, without determining prejudice.

IV.

In this circuit, a failure to lodge a *Batson* challenge is fatal. *See United States v. Skilling*, 554 F.3d 529, 562 (5th Cir. 2009) (citing *Dawson v. Wal-Mart Stores*, 978 F.2d 205, 208–09 (5th Cir. 1992). If a petitioner's counsel fails to object on *Batson* grounds, that challenge is procedurally defaulted. *See id.* However, "[a] prisoner may obtain federal review of a defaulted claim by showing cause for the default and prejudice from a violation of federal law." *See Martinez v. Ryan*, 566 U.S. 1, 10 (2012). "[W]hen attorney error amounts to constitutionally ineffective assistance of counsel, that error is imputed to the State (for the State has failed to comply with the constitutional requirement to provide effective counsel), rendering the error external to the petitioner." *See id.* at 23 (Scalia, J., dissenting). In determining whether Hebert was prejudiced, the majority opinion analyzed whether a *Batson* violation actually occurred. However, if counsel was not constitutionally ineffective, there was no error to impute to the State. Thus, there was no need to evaluate prejudice.

No. 17-30191

There is little guidance on whether a trial court must evaluate deficient performance before prejudice. With good reason, that process is left to the discretion of the trial courts. Here, given the facts and circumstances of this case, the road to prejudice seems much more arduous: (1) there were no *Batson* objections lodged at voir dire; (2) the State was not given the opportunity to proffer contemporaneous reasons and instead developed its explanation five years later; and (3) even the State contested the use of the long-delayed reasons as juror comparators. Furthermore, Hebert's *Batson* argument is not her substantive claim. It is evidence of her substantive claim that her counsel provided ineffective assistance by failing to object. Logically, the state and district courts judiciously took the path of greatest logic and least resistance.

In order to prevail on an ineffective assistance of counsel claim, a petitioner must prove deficient performance and prejudice. *See Strickland*, 466 U.S. at 687; *see also Amos*, 61 F.3d at 348. In this case, in order to prove prejudice, the court must evaluate whether the State committed a *Batson* violation. Under usual circumstances, in order to raise a *Batson* violation, the defendant must object and "make out a prima facie case of purposeful discrimination." *See Batson*, 476 U.S. at 93–94. Then the prosecution must raise contemporaneous[1] nondiscriminatory reasons for its strikes and "stand

---

[1] The timeliness of the reasons are important in analyzing whether the explanation is pretextual. *Cf. Miller-El*, 545 U.S. at 246 (noting that the State's later proffered explanation "reek[ed] of afterthought" and questioning the Fifth Circuit's willingness to accept the reasons, ignoring its "pretextual timing"). In *Chamberlin*, this circuit also recognized the importance of contemporaneous reasons.

> This narrow focus is essential to maintaining the integrity of the *Batson* framework, which requires a focus on the actual, *contemporaneous reasons* articulated for the prosecutor's decision to strike a prospective juror. The *timely expressed* neutral reasons, after all, are what must be tested for *veracity* by the trial court and later reviewing courts.

*Chamberlin*, 885 F.3d at 841 (emphasis added).

or fall on the plausibility of the reasons he gives." *See Miller-El v. Dretke*, 545 U.S. 231, 252 (2005). The trial court is then responsible for determining if these reasons are pretextual. *See Chamberlin*, 885 F.3d at 837–38.

But here there were no contemporaneous reasons to test for veracity because there were no *Batson* objections. What the state court had—to no fault of the State—were reasons mulled over and rendered five years after voir dire, "reek[ing] of afterthought." *Cf. Miller-El*, 545 U.S. at 246 (noting the difficulty in crediting later-developed explanations for striking a juror). The state court committed no error in disposing of the case without conducting this analysis.

Notably, Hebert did not make a prima facie showing of discrimination. At the state and district courts, in making her substantive ineffective assistance claim, Hebert contended prejudice was presumed "[w]here trial counsel fails to object to a prima facie case of discrimination" because discrimination in jury selection is a "structural error that requires automatic reversal."[2] Analyzing this argument, the state court found there was no prima facie case of prejudice and "petitioner's counsel used their experience and training in the most skillful manner to properly defend petitioner against the charges." Hebert argued that because the State offered reasons for why it may have struck the women, her requirement to make a prima facie case of discrimination was waived. The majority opinion seems to agree with this point. Also citing *Hernandez*, Hebert argues "once the prosecution has proffered gender-neutral reasons, the question of whether a prima facie case

---

[2] This circuit previously refrained from holding that "a structural error alone is sufficient to warrant a presumption of prejudice in the ineffective assistance of counsel context." *See Virgil v. Dretke*, 446 F.3d 598, 607 (5th Cir. 2006). However, the error "serves as an important guidepost in our evaluation of whether the state court's denial of [petitioner's] ineffective assistance of counsel claim was 'objectively reasonable' under AEDPA." *Id.*

existed becomes moot." This simplification misinterprets and misapplies *Hernandez* because: (1) the Supreme Court decision in *Hernandez* illuminates the discretionary power the trial court holds in *Batson* claims; and (2) *Hernandez* is distinguishable from the facts of this case.

In *Hernandez*, after nine jury members were empaneled, defense counsel objected to the prosecutor's use of its peremptory strikes against Latino venire members. *Id.* at 355–56. Without (1) waiting for the judge to rule on whether the defense established a prima facie showing or (2) arguing that the defense did not make a prima facie showing, the prosecutor volunteered reasons for his strikes. *Id.* at 356. The trial court denied defense counsel's motion. *Id.* at 357. On appeal, after reiterating the three-step process for evaluating a *Batson* claim, the Supreme Court ratified the trial court's actions. *Id.* at 359. It held there was no error in the not evaluating whether the defense made a prima facie case, and under those particular facts and circumstances the "departure from the normal course of proceedings" was of no concern. *Id.*

The facts and circumstances surrounding this case are completely distinguishable, and thus the question whether Hebert presented a prima facie case is not moot. Unlike in *Hernandez*, here, Hebert did not timely object, so the State did not offer a contemporaneous explanation. Furthermore, when Hebert raised this argument in her post-conviction application, the trial court had not yet ruled on intentional discrimination. Thus, she maintained the burden of making a prima facie showing of discrimination. *Cf. Hernandez*, 500 U.S. at 359 ("Once a prosecutor has offered a race neutral explanation for the peremptory challenges *and the trial court has ruled on the ultimate question of intentional discrimination*, the preliminary issue of whether the defendant made a prima facie showing becomes moot." (emphasis added)). The State submitted its explanations five years later in briefs responding to Hebert's

No. 17-30191

*Batson* argument. Before proffering those reasons, the State argued Hebert failed to make a prima facie showing of discrimination. Because of the unusual procedural posture, the State did not have the option of waiting until the trial court ruled on its prima facie argument before proffering a nondiscriminatory explanation. Thus, offering the explanation did not render the question moot and Hebert failed to make a prima facie showing of discrimination. Under these circumstances, the state court prudently avoided determining whether Hebert was prejudiced by a *Batson* violation by instead making a determination on her substantive claim, the effectiveness of Hebert's counsel. This was not an unreasonable application of clearly established law.

## V.

As such, I would have accorded deference to this determination and held the trial court did not act unreasonably in not reaching the prejudice prong and evaluating Hebert's *Batson* argument because Hebert failed to prove by the preponderance of the evidence that her counsel performed deficiently. Nevertheless, I specially concur in the judgment denying relief.